Stanley B. HENDLER, as Trustee in Bankruptcy of Farrell Publishing Corporation, Appellant,

v.

CUNEO EASTERN PRESS, INC., Appellee.

Nos. 283, 284, Dockets 25975-25976.

United States Court of Appeals Second Circuit.

Argued April 8, 1960.

Decided May 18, 1960.

Benedict Ginsberg, New York City, for appellant.

Samuel J. Silverman, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for appellee.

Before LUMBARD, Chief Judge, and HAND and HINCKS, Circuit Judges.

HAND, Circuit Judge.

This appeal is from an order of Levet, J. (165 F.Supp. 40), in the Southern District of New York, modifying an order of the referee, and dismissing a claim in bankruptcy of the bankrupt against the defendant, Cuneo Eastern Press, Inc., arising in tort.[1] The facts were as follows: The bankrupt was engaged in publishing two magazines known as "The Woman," and "Everybody's Digest." It had a contract with the defendant to print both of these for thirty-six (36) consecutive months, beginning in September, 1953, under which the parties had continued to work until January, 1954, at which time the contract had over two years still to run. The bankrupt had complained about the defendant's defective printing and late delivery and on January 22, 1954 it sent a letter to the defendant, the important part of which is as follows:

> "We hereby give you notice, because of multiple breaches of this contract on your part, and your repeated failure to perform in accordance with the terms of the contract, we are rescinding such contract effective with your completing all necessary work on the May 1954 issue of The Woman.

> \* \* \* \* \* \*

> "Because of your failure to perform in accordance with the terms of the contract existing between us we have suffered and are suffering very severe damages. We hold you fully responsible for such damages."

The defendant answered on January 26th, as follows:

> "We deny emphatically that we have been guilty of any breach of

1. In fact, the appeal involves two bankrupt publishing corporations; but, since these were for practical purposes so closely united as to be a single venture, it will be simpler to regard them as one.

this contract and are unaware of the nature of the alleged breaches which are unspecified. \* \* \*

"Under the circumstances, we cannot recognize your attempted rescission of this contract and hereby notify you that we stand ready to fulfill the performance thereof.

"We shall, of course, hold you fully accountable for any damages and loss of profit that may be sustained in case you persist in this repudiation."

A short time before it posted this letter to the defendant the bankrupt entered into negotiations with another printing company, The Rumford Press of Concord, New Hampshire to print the future issues of the two magazines. The defendant must have learned of these negotiations, for on February 3 its attorney in Philadelphia posted a letter to The Rumford Press which contained the following passage: "We are \* \* \* writing to inform you that any action on your part which induces, or which would induce, a breach of our client's contracts with the above named corporations will be actionable interference with our client's contractual rights. In such event our client would hold your Company accountable for the damage and loss of profits that would inevitably result from such breach." It is not clear from the record whether the bankrupt and The Rumford Press had entered into a firm contract for the printing of the magazines by The Rumford Press before it received the letter of February 3. Judge Levet held that the plaintiff had failed to prove the existence of a binding and valid contract at that time, and had at most no more than a temporary working agreement. This conclusion is borne out by the letter of February 15 of The Rumford Press's lawyer to the bankrupt saying that there were still matters which constituted a condition precedent upon any obligation of his client. However, we shall decide the appeal on the assumption that the bankrupt and The Rumford Press had concluded a firm contract at the time the defendant's letter of February 3 was received, since this is the assumption most favorable to the bankrupt's claim.

■ As a preliminary issue we must decide whether the defendant had at any time withdrawn its repudiation of January 26 of the bankrupt's attempted "rescission" of the printing contract. (Incidentally it may be noticed that both the referee and the judge found that the bankrupt's charges were not substantiated that the defendant had not adequately performed this contract.) At some time, which the record does not definitely fix, the defendant sent back to the bankrupt the "plates" and other equipment that it had received for printing the magazines, as well as the "copy" to be printed. The plaintiff argues that this return of the bankrupt's property proves that the defendant acceded to the "rescission" of January 22, and that therefore it had no interest to protect in interfering with the bankrupt's contract with The Rumford Press. We do not think that the return, the reason for which is nowhere explained, was proof that the defendant assented to the bankrupt's rescission of the original contract. Its letter of January 26 could not have been a more categorical repudiation of such a position. It continued to be "ready to fulfill the performance of the contract"; it would hold the bankrupt "fully accountable for any damages \* \* \* in case you persist in this repudiation." Its lawyer's letter to The Rumford Press on February 3 declared that for the addressee to print the magazines "will be actionable interference with" the defendant's "contractual rights." Although as we have just said, the record does not disclose why the defendant returned the property, there was plenty of reason to do so other than an acceptance of the bankrupt's rescission. The property belonged to the bankrupt and if it persisted in rescinding the contract would remain so. Its retention might affect the damages recoverable, and otherwise complicate the relations of the parties. If, on the other hand, the bankrupt did retract its rescission it would be a simple matter for the bankrupt to

send the property back. Moreover, the defendant had cross claims against the bankrupt arising out of other matters which might be prejudiced by the retention of the property. To infer from the return that the defendant meant to accept the bankrupt's wholly gratuitous wrong would be altogether unwarranted.

 Therefore, as the case stands, the only proof made by the plaintiff is that the defendant may have induced The Rumford Press either to refuse to perform an existing contract, or to desist in negotiations which, but for that intervention or "threat," as the plaintiff calls it, would have resulted in a contract. We do not mean to intimate that it is not an actionable tort against the obligee of a contract for a third party to induce the obligor to default in his performance. Although the obligee's remedy against the obligor remains, that is not an equivalent of performance, and in any event the obligee will be put to an action for damages. The tort in question took place in New Hampshire where the defendant's letter of February 3, 1954 was received by "The Rumford Press," and the Supreme Court of that state had adopted § 766 of the Restatement of Torts; as a "general principle." That section declares that "one who, without a privilege to do so, induces or otherwise purposely causes a third person not to (a) perform a contract with another, or (b) enter into or continue a business relation with another is liable to the other for the harm caused thereby." Russell v. Croteau, 98 N.H. 68, 94 A.2d 376. We will assume for argument that, even though The Rumford Press and the bankrupt had not yet come to a firm agreement when the defendant wrote its letter of February 3, the defendant would be obliged to show some "privilege" for intervening. The extent of that privilege is left somewhat at large. The Restatement, § 773 includes "in good faith asserting or threatening to protect properly a legally protected interest of his own which he believes may otherwise be impaired or destroyed by the performance of the contract or transaction." In the case at bar

the defendant had a "legally protected interest" which it believed might be "impaired" by the proposed contract of the bankrupt with The Rumford Press, so that the section applies. Prosser on Torts (2d ed.), § 106, p. 737, gives as one instance of the privilege, "a prior contract of his own." Carpenter, 41 Harv. L.Review, 746, says: "The plaintiff's interest in freedom from interference with contract relations may be invaded with impunity by the defendant in protecting a contract right of his own."

The decisions are not very helpful, it is true. Perhaps the nearest on the facts is Tidal Western Oil Corp. v. Shackelford, in the Texas Court of Civil Appeals, 297 S.W. 279, but the discussion is somewhat inconclusive. In Carmen v. Fox Film Corp., 269 F. 928, we were faced with the same situation but the suit was in equity and went off on the morals of the plaintiff. The fact that these were not relevant to the dismissal of the claim for damages does not seem to have occurred to us, and it would be scarcely fair to say that we deliberately decided the legal claim. The nearest to any such position is the sentence on page 931: "If the contracts with defendants were valid, she was under a legal and moral obligation not to make the contract with the Keeney corporation." There are dicta in two English decisions that are in accord. Thus in Read v. The Friendly Society (1902), 2 K.B. 88, 95: "a man who had affected to sell the same article to two separate purchasers could not possibly perform one contract without breaking the other, if both insisted on their rights, yet it could not render the purchaser who insisted on his contractual rights, liable at the suit of the other purchaser." See also Smithies v. National Association, [1909] 1 K.B. 310, 337, where this decision was cited with assent. Messina v. Continental Purchasing Co., 272 N.Y. 125, 5 N.E.2d 62, involves the same issue, but the discussion is scanty. Knapp v. Penfield, 143 Misc. 132, at pages 134–135, 256 N.Y.S. 41, at page 44 is a straight holding and the reason was "Persons acting for the protection of contract rights.

of their own which are of an equal or superior interest to another's contractual rights may invade the latter with impunity."

As a new question there can be no doubt as to the answer. If $A$ has promised one performance to $B$ and has later promised the same performance to $C$, $A$ cannot satisfy both promises. If he chooses to perform his contract with $C$ he remains liable to $B$ and that liability is measured by the value of what $B$ has lost, though, as we have said, the remedy is not the same thing as performance.

There is no justification for allowing $A$ the liberty to choose which of the two obligees he will grant the advantage: he is the wrongdoer. While it is true that $B$ and $C$ are equally innocent, there must be a choice between them, and if $A$ is eliminated as chooser the basis for choice can only be he who has the earlier claim. He may justly insist on preference; it cannot be a wrong against $A$ that he seeks to induce $C$ not to enforce that performance to which as between them $B$ himself has the preferred claim.

Judgment affirmed.